IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────

DWAYNE LESLIE

                    PLAINTIFF,

           -versus-


THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE OFFICER
 "JOHN DOES 1-9"

                   DEFENDANTS.

───────────────────────────────────────

INDEX NO.




COMPLAINT
[JURY TRIAL
DEMANDED],

Plaintiff DWAYNE LESLIE ("Plaintiff DWAYNE LESLIE") by his attorneys, THE LAW OFFICES OF WYLIE M. STECKLOW, complaining of the defendants, respectfully allege as follows:

## I. PRELMINARY STATEMENT

1.    Plaintiff DWAYNE LESLIE bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.    On Wednesday, April 6, 2011 at or around 6:00 P.M., Plaintiff DWAYNE LESLIE was present at the home of a childhood friend in Rosedale Queens, New York, visiting with said childhood friend's husband after picking up that friend's young child from school. After a brief time there, Plaintiff DWAYNE LESLIE took a walk to a local corner store for some candy. Plaintiff DWAYNE LESLIE then walked to the store and purchased some candy as intended. On his way out of the store, Plaintiff DWAYNE LESLIE saw a friend and approached him to say hello. Seconds later, Plaintiff DWAYNE LESLIE was being tackled to the ground and brutally beaten by four or more Defendant "John Doe" POLICE OFFICERS. The Defendant "John Doe" POLICE OFFICERS later alleged that Plaintiff DWAYNE LESLIE sold two pills of ecstasy to one of the Defendant "John Doe" POLICE OFFICERS prior to his arrest. Further, Defendant "John Doe" POLICE OFFICERS alleged that Plaintiff DWAYNE LESLIE resisted his arrest. Following his arrest, Plaintiff DWAYNE LESLIE was charged with (1) Criminal Sale of a Controlled Substance ("CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5") in the fifth degree (a class D felony); and (2) Resisting Arrest (a misdemeanor). Plaintiff DWAYNE LESLIE was held in the custody of Defendant "John Doe" POLICE OFFICERS until his April 9, 2011 arraignment. Throughout much of

these three (3) days, Plaintiff DWAYNE LESLIE was handcuffed to a hospital bed. As a result of his brutal beating at the hands of Defendant "John Doe" POLICE OFFICERS, Plaintiff DWAYNE LESLIE received multiple serious injuries. Plaintiff DWAYNE LESLIE'S left ankle was both broken and dislocated, requiring surgery, which was undertaken while Plaintiff was in police custody. Plaintiff DWAYNE LESLIE received a depressed left inferior orbital fracture which caused him double vision immediately after the incident and blurry vision in his left eye thereafter. Plaintiff DWAYNE LESLIE received other cuts and bruises. Over a total of four (4) appearances in the Queens Criminal Court, Plaintiff DWAYNE LESLIE, (1) The CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 charge against him was dismissed, as the pills allegedly recovered from the Plaintiff were determined to contain no illegal substances; and (2) Plaintiff DWAYNE LESLIE received an Adjournment in Contemplation of Dismissal with respect to the remaining resisting arrest charge. Plaintiff DWAYNE LESLIE brings this action in a quest for answers as to why he was punitively arrested without probable cause, brutally beaten, detained at length, and subjected to prosecution in the absence of criminal conduct.

3.    In compliance with the Southern District's "PLAN FOR CERTAIN § 1983 CASES AGAINST THE CITY OF NEW YORK," attached hereto as **Exhibit "A"** is an executed §160.50 release for the Plaintiff.

4.    In compliance with the Southern District's "PLAN FOR CERTAIN § 1983 CASES AGAINST THE CITY OF NEW YORK," attached hereto as **Exhibit "B"** are several executed medical records releases for the Plaintiff.

## II. JURISDICTION

5.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

6.    Plaintiff DWAYNE LESLIE further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## III. VENUE

7.    Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because Defendant CITY OF NEW YORK maintains its primary and relevant place(s) of business in this district.

## IV. JURY DEMAND

8.    Plaintiff DWAYNE LESLIE respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

9.     At all times pertinent to this complaint, Plaintiff DWAYNE LESLIE is and was a resident of the City of New York, State of New York, and the County of Queens.

10.    Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

11.    Defendant THE CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

12.    That at all times hereinafter mentioned, the Defendant Police Officers "JOHN DOES 1-9" (collectively "Defendant POLICE OFFICERS" or individually "Defendant POLICE OFFICER") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

13.    The identities of the Defendant "John Does POLICE OFFICERS at issue here are unknown to Plaintiff DWAYNE LESLIE at this time.

14.    Plaintiff DWAYNE LESLIE will amend this complaint to name the Defendant POLICE OFFICERS as their identities become available to Plaintiff DWAYNE LESLIE.

15.    That at all times hereinafter mentioned the Defendant "John Doe" POLICE OFFICERS were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

16.    Each and all of the acts of the Defendant "John Doe" POLICE OFFICERS alleged herein were done by said defendants while acting within the scope of their employment by defendant THE CITY OF NEW YORK.

17.    Each and all of the acts of the Defendant "John Doe" POLICE OFFICERS alleged herein were done by said defendants while acting in furtherance of their employment by defendant THE CITY OF NEW YORK.


## VI. FACTS COMMON TO ALL CLAIMS


18.    Plaintiff DWAYNE LESLIE is a twenty-nine (29) year-old male.

19.    Plaintiff DWAYNE LESLIE is married.

20.   Plaintiff DWANYE LESLIE is a college graduate.

21.   Plaintiff DWAYNE LESLIE has a Bachelor's Degree in History.

22.   At the time of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE, Plaintiff DWAYNE LESLIE was contemplating applying to graduate school at Columbia University.

23.   The events herein described began at or around 6:00pm on April 6, 2011.

24.   On the evening of April 6, 2011, Plaintiff DWAYNE LESLIE was present at the home of a childhood friend in Rosedale Queens, New York.

25.   Plaintiff DWAYNE LESLIE was present at the home of a childhood friend in Rosedale Queens, New York in order to visit with that childhood friend's husband.

26.   Plaintiff DWAYNE LESLIE'S visiting of a childhood friend's husband in Rosedale Queens, New York on April 6, 2011 at or around 6:00 P.M. took place after Plaintiff DWAYNE LESLIE had picked up that childhood friend's young child from school.

27.   During Plaintiff DWAYNE LESLIE's visit with a childhood friend's husband in Rosedale Queens, New York on April 6, 2011 at or around 6:00 P.M., Plaintiff DWAYNE LESLIE decided to walk to Jabbar Famous Deli (a local corner store) in order to purchase some candy.

28.   After Plaintiff DWAYNE LESLIE entered Jabbar Famous Deli he purchased some candy.

29.   Following his purchase of the aforementioned candy from Jabbar Famous Deli, Plaintiff DWAYNE LESLIE exited that same local corner store.

30.   After exiting the local corner store Plaintiff DWAYNE LESLIE saw a friend.

31.   After seeing a friend outside the local corner store, Plaintiff DWAYNE LESLIE approached him in order to say hello.

32.   At that time, several of the Defendant "John Doe" POLICE OFFICERS tackled Plaintiff DWAYNE LESLIE to the ground.

33.   At that time each of the Defendant "John Doe" POLICE OFFICERS was in plainclothes.

34.   Following being tackled to the ground by the Defendant "John Doe" POLICE OFFICERS, Plaintiff DWAYNE LESLIE was then kicked by the Defendant "John Doe" POLICE OFFICERS.

35.   Plaintiff DWAYNE LESLIE screamed at this time, in sum and substance, "THEY ARE GOING TO KILL ME!"

36.   In the course of brutally beating Plaintiff DWAYNE LESLIE, or directly thereafter, the Defendant "John Doe" POLICE OFFICERS arrested Plaintiff DWAYNE LESLIE.

37.   Plaintiff DWAYNE LESLIE received multiple injuries from the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE.

38.   Plaintiff DWAYNE LESLIE'S left ankle was broken as a result of the April 6, 211 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE.

39.   Plaintiff DWAYNE LESLIE'S left ankle was dislocated as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESIE.

40.   The injuries sustained to Plaintiff DWAYNE LESLIE'S left ankle as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE required a surgical open reduction.

41.   The injuries sustained to Plaintiff DWAYNE LESLIE'S left ankle as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff required fixation with metal rods.

42.   The injuries sustained to Plaintiff DWAYNE LESLIE'S left ankle as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE required fixation with metal pins.

43.   The aforementioned metal rods and pins will remain inside Plaintiff DWAYNE LESLIE's left ankle for the remainder of his life.

44.   Plaintiff DWAYNE LESLIE received a depressed left inferior orbital fracture as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE.

45.   Plaintiff DWAYNE LESLIE describes the aforementioned "left inferior orbital fracture" injury sustained as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff as a "Broken face below the left eye, crushed inward."

46.   Plaintiff DWAYNE LESLIE'S aforementioned "left inferior orbital fracture" injury sustained as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendants "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE caused him double vision immediately after the incident and brutal beating.

47.   Plaintiff DWAYNE LESLIE'S aforementioned "left inferior orbital fracture" injury sustained as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE caused him blurry vision in his left eye.

48.   Plaintiff DWAYNE LESLIE'S aforementioned "left inferior orbital fracture" injury sustained as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendants "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE caused him blurry vision in his left eye for an extended period of time following the incident and brutal beating.

49.   Plaintiff DWAYNE LESLIE suffered other cuts and bruises as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE.

50.   Plaintiff DWAYNE LESLIE'S two (2) front teeth were loosened as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE.

51.   Plaintiff DWAYNE LESLIE suffered terror, humiliation and mental anguish as a result of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE.

52.   Following this arrest by Defendant "John Doe" POLICE OFFICERS, Plaintiff DWAYNE LESLIE was searched by one or more of the Defendant "John Doe" POLICE OFFICERS.

53.   Upon information and belief, the search of Plaintiff DWAYNE LESLIE by one or more of the Defendant "John Doe" POLICE OFFICERS found no narcotics, weapons, or contraband of any kind.

54.   Upon information and belief, following the search of Plaintiff DWAYNE LESLIE by one or more of the Defendant "John Doe" POLICE OFFICERS that found no narcotics, weapons, or contraband of any kind, one of the Defendant "John Doe" POLICE OFFICERS, a relatively short male, exclaimed, in sum and substance, "FUCK!  FUCK!  FUCK!  WE MESSED UP!"

55.   Nevertheless, following his arrest by Defendant "John Doe" POLICE OFFICERS, Plaintiff DWAYNE LESLIE was charged with Criminal Sale of a Controlled Substance in the Fifth Degree ("CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5").

56.   In the State of New York, CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 is a Class D felony offense.

57.   In accordance with the State of New York's Penal Code § 220.31, CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 is punishable by up to seven (7) years in prison.

58.   There was no basis in fact for charging Plaintiff DWAYNE LESLIE with CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5.

59.   Following his arrest by Defendant "John Doe" POLICE OFFICERS, Plaintiff DWAYNE LESLIE was charged with Resisting Arrest.

60.   In the State of New York Resisting Arrest is a misdemeanor offense.

61.   There was no basis in fact for charging Plaintiff DWAYNE LESLIE with Resisting Arrest.

62.   The initial criminal complaint filed against Plaintiff DWAYNE LESLIE falsely alleges that an undercover narcotics officer approached Plaintiff DWAYNE LESLIE in order to solicit marijuana from Plaintiff DWAYNE LESLIE.

63.   The initial criminal complaint filed against Plaintiff DWAYNE LESLIE falsely alleges that an undercover narcotics officer approached Plaintiff DWAYNE LESLIE in order to ostensibly purchase marijuana from Plaintiff DWAYNE LESLIE.

64.   The initial criminal complaint filed against Plaintiff DWAYNE LESLIE falsely alleges that when Plaintiff DWANYE LESLIE heard this solicitation or ostensible request for purchase, Plaintiff DWAYNE LESLIE replied to aforementioned undercover narcotics officer that he (Plaintiff DWAYNE LESLIE) did not have any marijuana.

65.   The initial criminal complaint filed against Plaintiff DWAYNE LESLIE falsely alleges that when Plaintiff DWAYNE LESLIE heard this solicitation or ostensible request for purchase, Plaintiff DWAYNE LESLIE replied to aforementioned undercover narcotics officer that he (Plaintiff DWAYNE LESLIE) could get the narcotics officer ecstasy.

66.   The initial criminal complaint filed against Plaintiff DWAYNE LESLIE falsely alleges that Plaintiff DWAYNE LESLIE sold two pills of ecstasy to the aforementioned undercover narcotics officer.

67.   The initial criminal complaint filed against Plaintiff DWAYNE LESLIE falsely alleges that Plaintiff DWAYNE LESLIE sold two pills of ecstasy to the aforementioned undercover narcotics officer prior to his arrest.

68.   On information and belief, the allegations set forth in the initial criminal complaint were entirely false.

69.   In fact, no illegal substances whatsoever were recovered from Mr. Leslie at any point in the incident described herein.

70.   On information and belief, the pills of "ecstasy" were individual pieces of the candy purchased by Plaintiff DWAYNE LESLIE at the deli immediately prior to his arrest and brutal beating.

71.   On information and belief, it is common practice among NYPD narcotics officers to proffer planted and/or false drugs to support arrests.

72.   On information and belief, this practice is known as "flaking."

73.   On information and belief, "flaking" is often undertaken to meet quantitative performance goals for enforcement activities, i.e., "arrest quotas."

74.   Information supporting the existence of the above-referred practices of "flaking" and "arrest quotas" are pled in detail below, in denominated sections.

75.   The initial criminal complaint filed against Plaintiff DWAYNE LESLIE falsely alleges that Plaintiff DWAYNE LESLIE resisted his arrest.

76.   Plaintiff DWAYNE LESLIE did not resist arrest.

77.   Plaintiff DWAYNE LESLIE was tackled to the ground and beaten brutally by the Defendant Police Officers before he could even know that he was under arrest.

78.   Upon information and belief, Plaintiff DWAYNE LESLIE was not aware that the persons who assaulted him were in fact police officers at the time that the Defendant POLICE OFFICERS tackled and brutally beat Plaintiff DWAYNE LESLIE.

79.   At least two (2) individuals witnessed the incident and brutal beating surrounding Plaintiff DWAYNE LESLIE'S April 6, 2011 Rosedale Queens, New York interaction with the Defendant "John Doe" POLICE OFFICERS.

80.   Upon information and belief, each of the two (2) or more witnesses from the scene of Plaintiff DWAYNE LESLIE'S April 6, 2011 Rosedale Queens, New York interaction with the Defendant "John Doe" POLICE OFFICERS indicated that the Defendant "John Doe" POLICE OFFICERS rationale for Plaintiff DWAYNE LESLIE'S arrest was uncertain at the time of the arrest.

81.   Plaintiff DWAYNE LESLIE was in the custody of the New York Police Department for the remainder of the day following his April 6, 2011 Rosedale Queens, New York arrest.

82.   Plaintiff DWAYNE LESLIE was in the custody of the New York Police Department for the entire twenty-four (24) hour period of April 7, 2011 following his April 6, 2011 Rosedale Queens, New York arrest.

83.   Plaintiff DWAYNE LESLIE was in the custody of the New York Police Department for the entire twenty-four hour (24) period of April 8, 2011 following his April 6, 2011 Rosedale Queens, New York arrest.

84.   Plaintiff DWAYNE LESLIE was in the custody of the New York Police Department for the entire period of April 9, 2011 until the time of his April 9, 2011 arraignment, which followed his April 6, 2011 arrest.

85.   While in the custody of the New York Police Department following his April 6, 2011 arrest and prior to his April 9, 2011 arraignment, Plaintiff DWAYNE LESLIE spent a period of that time at the hospital.

86.   During this period at the hospital, while Plaintiff DWAYNE LESLIE was still in the custody of the New York Police Department, Plaintiff DWAYNE LESLIE was handcuffed to his hospital bed.

87.   During this period at the hospital, despite substantial pain, Plaintiff DWAYNE LESLIE was consistently agreeable and pleasant in his interactions with the non-defendant police officers assigned to guard him.

88.   During this period at the hospital, despite substantial pain, Plaintiff DWAYNE LESLIE was consistently cooperative and compliant in his interactions with the non-defendant police officers assigned to guard him.

89.   During a period of this time at the hospital, while Plaintiff DWAYNE LESLIE was still in the custody of the New York Police Department and handcuffed to his hospital bed, Plaintiff DWAYNE LESLIE had just received surgery on his left ankle.

90.   During this period, as a result of the recent surgery on his left ankle, Plaintiff DWAYNE LESLIE could not walk without crutches.

91.   During this period, as a result of the recent surgery on his left ankle, Plaintiff DWAYNE LESLIE was not a flight risk.

92.   During this period, as a result of the recent surgery on his left ankle and/or Plaintiff DWAYNE LESLIE's entirely cooperative, pleasant and agreeable demeanor, the Defendant New York Police Department's act of handcuffing Plaintiff DWAYNE LESLIE to his hospital bed constituted an unnecessary use of force.

93.   During this period, as a result of the recent surgery on his left ankle and/or Plaintiff DWAYNE LESLIE's entirely cooperative, pleasant and agreeable demeanor, the Defendant New York Police Department's act of handcuffing Plaintiff DWAYNE LESLIE to his hospital bed constituted an excessive use of force.

94.   After a time, Plaintiff DWAYNE LESLIE was discharged from the hospital to police custody holding pending arraignment.

95.   Plaintiff DWAYNE LESLIE was prescribed pain-killers and anti-inflammatory medicines as a result of his injuries sustained in the incident.

96.   Plaintiff DWAYNE LESLIE was prescribed pain-killers and anti-inflammatory medicines as a result of the pain and swelling he suffered from his injuries sustained in the incident.

97.   After a time, Plaintiff DWAYNE LESLIE was transported from the hospital back to the police precinct for holding pending arraignment.

98.   Upon information and belief, Plaintiff DWAYNE LESLIE was held overnight at the precinct on the night of April 8, 2011.

99.   Upon information and belief, Plaintiff DWAYNE LESLIE was not given his prescribed medications while in police custody.

100. Upon information and belief, Plaintiff DWAYNE LESLIE was not allowed to use his crutches while in police custody.

101. As a result, Plaintiff DWAYNE LESLIE suffered considerable pain while in police custody.

102. Upon information and belief, Plaintiff DWAYNE LESLIE did not receive his medications for ten (10) or more hours prior to his arraignment.

103. On April 9, 2011, Plaintiff DWAYNE LESLIE was forced to hop, without his crutches and without pain medication, approximately 210 feet from the police transport to the Queens Criminal Court holding area.

104. Plaintiff DWAYNE LESLIE was present, in court, bandaged and in substantial pain, for his April 9, 2011 arraignment.

105. Plaintiff DWAYNE LESLIE was released on his own recognizance at his April 9, 2011 arraignment.

106. Following his April 9, 2011 arraignment, Plaintiff DWAYNE LESLIE next appeared in Queens Criminal Court on May 4, 2011.

107. Before Plaintiff DWAYNE LESLIE'S May 4, 2011 appearance in Queens Criminal Court, Plaintiff DWAYNE LESLIE had been charged with CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5.

108. As of May 4, 2011, the CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 charge preferred against Plaintiff DWAYNE LESLIE'S was based on Plaintiff DWAYNE LESLIE'S alleged sale of "ecstasy" to the aforementioned undercover narcotics officer.

109. As of May 4, 2011, a chemical substance test had been conducted on the "ecstasy" which Plaintiff DWAYNE LESLIE had allegedly sold to the aforementioned undercover narcotics officer.

110. As of May 4, 2011, the chemical substance test which had been conducted on the "ecstasy" which Plaintiff DWAYNE LESLIE had allegedly sold to the aforementioned undercover narcotics officer revealed that the alleged "ecstasy" contained no illegal substances.

111. On May 4, 2011, the CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 charge against Plaintiff DWAYNE LESLIE was dismissed on motion of the prosecution.

112. As of May 4, 2011, the CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 charge against Plaintiff DWAYNE LESLIE was dismissed on motion of the prosecution because the prosecution could not prove beyond a reasonable doubt that Plaintiff DWAYNE LESLIE had attempted to sell or sold an illegal substance to the aforementioned undercover narcotics officer during the incident(s) surrounding Plaintiff DWAYNE LESLIE'S April 6, 2011 Rosedale Queens, New York interactions with Defendants "John Doe" POLICE OFFICERS.

113. As of May 4, 2011 the CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 charge against Plaintiff DWAYNE LESLIE was dismissed because Plaintiff DWAYNE LESLIE was not in possession of a controlled substance at the time of his arrest.

114. Upon information and belief, as of May 4, 2011, the CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 charge against Plaintiff DWAYNE LESLIE was dismissed because the great weight of the evidence indicated that Plaintiff DWAYNE LESLIE was charged with CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 as a "cover-charge."

115. Upon information and belief, as of May 4, 2011, the CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 charge against Plaintiff DWAYNE LESLIE was dismissed because the great weight of the evidence indicated that Plaintiff DWAYNE LESLIE was charged with CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 in a "flaking" arrest using no actual controlled substances.

116. Upon information and belief, as of May 4, 2011 the CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 charge against Plaintiff DWAYNE LESLIE had been dismissed because the great weight of the evidence indicated that Plaintiff DWAYNE LESLIE was charged with CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 as a result of the Defendant "John Doe" POLICE OFFICERS attempt to meet the New York Police Department's "arrest quotas."

117. Upon information and belief, the "ecstasy" tested by police officers and allegedly forming the basis for Plaintiff DWAYNE LESLIE's arrest was in fact two pieces of the candy that Plaintiff DWAYNE LESLIE had purchased immediately prior to his arrest and brutal beating.

118. As of May 4, 2011, Plaintiff DWAYNE LESLIE'S Resisting Arrest Charge remained outstanding.

119. From May 4, 2011 through September 27, 2011 Plaintiff DWAYNE LESLIE appeared in Queens Criminal Court on four (4) separate occasions.

120. Over this time, the Queens District Attorney Integrity Bureau was investigating the propriety of the Resisting Arrest charge against Plaintiff DWAYNE LESLIE.

121. Plaintiff DWAYNE LESLIE appeared in Queens Criminal Court on May 4, 2011.

122. At that time, Plaintiff DWAYNE LESLIE consented to an adjournment of the case against him, for the express purpose of allowing the Queens District Attorney's Office to complete its investigation.

123. Plaintiff DWAYNE LESLIE appeared in Queens Criminal Court on May 31, 2011.

124. At that time, Plaintiff DWAYNE LESLIE consented to an adjournment of the case against him, for the express purpose of allowing the Queens District Attorney's Office to complete its investigation.

125. Plaintiff DWAYNE LESLIE appeared in Queens Criminal Court on July 27, 2011.

126. At that time, Plaintiff DWAYNE LESLIE consented to an adjournment of the case against him, for the express purpose of allowing the Queens District Attorney's Office to complete its investigation.

127. Plaintiff DWAYNE LESLIE appeared in Queens Criminal Court on September 27, 2011.

128. At Plaintiff DWAYNE LESLIE'S September 27, 2011 appearance in Queens Criminal Court, Plaintiff DWAYNE LESLIE received an Adjournment in Contemplation of Dismissal for the sole charge remaining outstanding against him, Resisting Arrest.

129. Upon information and belief, the charges preferred against Plaintiff DWAYNE LESLIE'S were "cover-charges" brought in order to justify the Defendant "John Doe" POLICE OFFICERS' illegal "Contempt of Cop" arrest.

130. Upon information and belief, the charges preferred against Plaintiff DWAYNE LESLIE'S were "cover-charges" brought in order to justify the Defendant "John Doe" POLICE OFFICERS' illegal "flaking" arrest.

131. Upon information and belief, the charges preferred against Plaintiff DWAYNE LESLIE'S were "cover-charges" brought in order to justify the Defendant "John Doe" POLICE OFFICERS' illegal use of excessive force against Plaintiff DWAYNE LESLIE.

132. At the time of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE, Plaintiff DWAYNE LESLIE did not have any warrants outstanding for his arrest.

133. At the time of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE, Plaintiff DWAYNE LESLIE was not carrying a weapon of any sort.

134. At the time of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS

upon Plaintiff DWAYNE LESLIE, Plaintiff DWAYNE LESLIE was not carrying any illegal substances.

135. At the time of the April 6, 2011 Rosedale Queens, New York incident and brutal beating administered by the Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE, Plaintiff DWAYNE LESLIE was not engaged in any illegal activity of any kind.

136. The April 6, 2011 incident and its aftermath described herein constituted Plaintiff Dwayne Leslie's only interactions with the New York City Police Department to date.

137. The April 6, 2011 incident and its aftermath described herein constituted Plaintiff Dwayne Leslie's only interactions with the American system of jurisprudence to date.

138. As a result of the foregoing, Plaintiff DWAYNE LESLIE sustained, inter alia, mental injuries, emotional distress, embarrassment, loss of property, damage of property, humiliation, and deprivation of his constitutional rights.

## "CONTEMPT OF COP" AND "COVER CHARGE" ARRESTS

139. On February 28, 2008, the Seattle Post-Intelligencer published an investigative review of six (6) years of Seattle Municipal Court files, wherein the Post-Intelligencer's investigators found that African-Americans in that predominantly Caucasian city were arrested solely on charges of "obstructing a public officer" and related crimes such as resisting arrest eight times as often as Caucasians.[1]

140. The Seattle Post-Intelligencer's investigative review cited above also found that the Seattle City Attorney's Office dropped nearly half of all Seattle criminal cases predicated solely on charges of "obstructing a public officer" and related crimes such as resisting arrest between January 2002 and 2008. See fn1.

141. In response to Seattle Police officers' questionable arrest activities discussed above, "Leo Poort, the [Seattle Police] department's legal adviser, included warnings about obstruction arrests in… his top twelve (12) tips to officers for 'avoiding civil liability lawsuits.' 'Don't arrest for 'contempt' of cop,' he wrote in tip No. 3. 'Officers must be thick skinned and not unduly influenced by the attitudes of persons they contact. Flunking the 'attitude' test (is) not a bookable offense.'" See fn1.

---

[1] Nalder, Kamb and Lathrop, "Blacks Are Arrested on 'Contempt of Cop' Charge at Higher Rate," Seattle Post-Intelligencer, February 28, 2008. Article incorporated herein by reference and available online at http://www.seattlepi.com/local/353020_obstructmain28.asp

142. In a review of San Jose criminal cases published on October 31, 2009, the San Jose Mercury News reported that the Santa Clara County Prosecutor declined to prosecute over one-third (33.33…%) of resisting arrest cases brought by San Jose police, a rate that is markedly disproportionate to the Santa Clara County Prosecutor's general twenty percent (20%) decline-to-prosecute rate.[2]

143. The San Jose Mercury News investigation cited above also found that the San Jose Police Department did not sustain or substantiate civilian complaints with respect to any of the ninety-nine (99) use-of-force cases that it reviewed in 2008, even though the San Jose Independent Police Auditor disagreed with police findings in twenty-five (25) of those 99 cases. See fn2.

144. In response to the San Jose Mercury News investigation cited above, the San Jose Police Department instituted a new policy of tracking arrests where it appears that resisting arrest is being used as a cover charge to justify unnecessary and excessive police uses of force on civilians. See fn2.

145. A November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that at that time, Defendant City of New York did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest.[3]

146. November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that at that time, Defendant City of New York did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest, despite considerable anecdotal evidence that New York City Police Officers were arresting individuals on those and other like charges to justify use of force and/or to punish those individuals for "contempt of cop." See fn3.

147. The above-cited New York Times special report noted that Los Angeles had already instituted a system for tracking the initiation and dispositions of "contempt of cop" and "cover charge" charges such as resisting arrest and disorderly conduct as of the time of that article's publication in 1997.  See fn3.

---

[2] Webby, Sean, "Mercury News investigation: San Jose police often use force in resisting-arrest cases,"  San Jose Mercury News, October 31, 2009.  Article incorporated by reference herein and available online at http://www.mercurynews.com/top-stories/ci_13686438?nclick_check=1

[3] Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report.; Disrespect as Catalyst for Brutality," New York Times, November 19, 1997.  Article incorporated by reference herein and available online at http://query.nytimes.com/gst/fullpage.html?res=9807E7D9163BF93AA25752C1A 961958260&scp=8&sq=contempt+of+cop&st=cse&pagewanted=all

148. Upon information and belief, the "contempt of cop" and "cover charge" charges levied most regularly by New York City Police Officers are disorderly conduct, resisting arrest, and obstruction of governmental administration.

149. Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration are relatively easy for police to levy in the absence of actual probable cause because they may arise out of nearly any police-civilian interactions.

150.  Upon information and belief, "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration are relatively easy for police to levy in the absence of actual probable cause because they can be levied solely upon the allegations of the arresting officer(s) without reference to physical evidence or witness observation of criminal acts.

151. Upon information and belief, to date, Defendant City of New York has not implemented any particular, training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

152. Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing decades-old custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, to date, Defendant City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

153. Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date, Defendant City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

154. Upon information and belief, and despite due and repeated notice that New York City Police Officers such as the Defendant Police Officers have charged and continue to charge individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant City of New York has not implemented any particular oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges such as disorderly conduct, resisting arrest, and obstruction of governmental administration.

155. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been motivated in whole or in part by the aforesaid custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, and/or to justify punitive false arrests because Plaintiff DWAYNE LESLIE'S arrests were undertaken in the absence of probable cause to arrest.

156. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been motivated in whole or in part by the aforesaid custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, and/or to justify punitive false arrests because they were undertaken in a manner which indicated that the individual Defendant Police Officers who participated in Plaintiff DWAYNE LESLIE's arrest made the determination to arrest Plaintiff DWAYNE LESLIE before determining why Plaintiff DWAYNE LESLIE should be arrested.

157. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been motivated in whole or in part by the aforesaid custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, and/or to justify punitive false arrests, because the Defendant Police Officers arrested and initiated criminal proceedings against Plaintiff DWAYNE LESLIE after it was already established that Plaintiff DWAYNE LESLIE was not carrying any weapons or illegal substances, and did not have any outstanding warrants against him, but after Plaintiff DWAYNE LESLIE had been seized and brutally beaten by the Defendant Police Officers.

## "TESTILYING" and "FLAKING" ARRESTS

158. On information and belief, the arrest of Plaintiff DWAYNE LESLIE was predicated on a false allegation that Plaintiff DWAYNE LESLIE had made a drug sale to an undercover police officer.

159. On information and belief, Plaintiff DWAYNE LESLIE did not in fact possess any drugs or sell any drugs to any person.

160. On information and belief, one or more Defendant Police Officers falsely alleged that Plaintiff DWAYNE LESLIE sold drugs to an undercover police officer in order to justify the arrest and brutal beating of Plaintiff DWAYNE LESLIE.

161. On July 7, 1994, a blue ribbon panel led by Hon. J. Milton Mollen ("The Mollen Commission") presented the report of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins ("The Mollen Commission Report," "The Report")[4].

162. The Mollen Commission Report was subtitled "ANATOMY OF FAILURE: A PATH FOR SUCCESS."  The Report at page before "i."

163. The July 7, 1994 *Mollen Commission Report* was prepared for and at the request of the Defendant City of New York, and therefore knowledge of its contents may be imputed to Defendant City of New York.

164. Among the species of police corruption explored in The Report, particular note was made of the practice of "testilying," or false testimony and falsification of records in connection with arrests.  The Report at 36.

165. The Mollen Commission found "testilying" to be "probably the most common form of police corruption facing the criminal justice system, particularly in connection with arrests for possession of narcotics and guns."  Id.

166. The Mollen Commission explained that officers are particularly prone to engage in "testilying" with respect to said charges because "[t]he vast majority of charges for narcotics or weapons possession crimes result in pleas without the necessity of grand jury or trial testimony, thus obviating officers' concerns about the risk of detection and possible exposure to criminal charges of perjury."  The Report at 37.

167.  The Mollen Commission made particular note of "testilying" in an undisclosed unit of the NYPD's narcotics division, "where… [The Mollen Commission's] analysis of police records and intelligence sources indicated that the incidence of falsifications might run high."  The Report at 38-39.

168. The Report continues: "While we cannot disclose the details of our investigation because we have referred the evidence to a prosecutor, the evidence suggests that certain officers in this unit falsified documents and may have committed testimonial perjury to conceal constitutional violations.  Even

---

[4] Mollen, Baer, Evans, Lankler, Tyler, Armao, Cornfeld, "The City of New York Commission to Investigate Allegations of Police Corruption and The Anti-Corruption Procedures of The Police Department Commission Report," July 7, 1994, City of New York.  Incorporated by reference herein and available online at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

more troubling, **the evidence suggests that the unit's commanding officer not only tolerated, but encouraged, this unlawful practice**." The Report at 39 (emphasis added).

169. The practice of officers "testilying" with respect to narcotics charges continues in the NYPD to date.

170. Upon information and belief, the practice of officers "testilying" with respect to narcotics charges continues to be emploed with particular frequency by narcotics officers in Brooklyn and Queens.

171. In 2008, now-former NYPD undercover officer Steve Anderson was caught on video purchasing three bags of cocaine from an employee of a nightclub in Queens.[5]

172. Anderson did not arrest the person who sold the drugs to him. Id.

173. Instead, Anderson provided the drugs to then-fellow NYPD undercover officer Henry Tavarez. Id.

174. Tavarez then used the drugs to support the false arrests of four people. Id.

175. As a result of this and like incidents, prosecutors in Brooklyn and Queens have dismissed charges against approximately four hundred (400) individuals whose arrests were believed to have been tainted by the corrupt acts of NYPD officers. Id.

176. Another detective from the same unit, Jason Arbeeny, was recently convicted of various crimes in relation to his own 2007 conduct of planting a bag of crack cocaine in the car of a Coney Island couple to support narcotics charges against said couple.[6]

177. In that case, on November 1, 2011, "[b]efore announcing the verdict, Justice Reichbach scolded the department for what he described as a widespread culture of corruption endemic in its drug units. 'I thought I was not naïve,' he said. 'But even this court was shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed.'" Id.

178. Justice Reichbach continued: "Anything goes in the never-ending war on drugs… and a refusal to go along with questionable practices raise the specter of blacklisting and isolation." Id.

---

[5] Jim Dwyer, "The Drugs? They Came From The Police," New York Times, October 13, 2011, incorporated by reference herein and available online at http://www.nytimes.com/2011/10/14/nyregion/those-drugs-they-came-from-the-police.html?ref=nyregion
[6] Tim Stellow, "Detective is Found Guilty of Planting Drugs," New York Times, November 1, 2011, incorporated by reference herein and available online at http://www.nytimes.com/2011/11/02/nyregion/brooklyn-detective-convicted-of-planting-drugs-on-innocent-people.html?_r=2&partner=rss&emc=rss

179. The practice of false drug arrests is colloquially referred to as "flaking."[7]

180. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been effected in whole or in part by the aforesaid practices of "testilying" and "flaking" because Plaintiff DWAYNE LESLIE'S arrests were undertaken in the absence of probable cause to arrest.

181. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been effected in whole or in part by the aforesaid practices of "testilying" and "flaking" because it was undertaken in a manner which indicated that the individual Defendant Police Officers who participated in Plaintiff DWAYNE LESLIE's arrest made the determination to arrest Plaintiff DWAYNE LESLIE for CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 when Plaintiff DWAYNE LESLIE had not sold any drugs to any person.

182. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been effected in whole or in part by the aforesaid practices of "testilying" and "flaking" because it was undertaken in a manner which indicated that the individual Defendant Police Officers who participated in Plaintiff DWAYNE LESLIE's arrest made the determination to arrest Plaintiff DWAYNE LESLIE for CRIMINAL SALE OF A CONTROLLED SUBSTANCE 5 when Plaintiff DWAYNE LESLIE had been in possession of any drugs.

183. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been effected in whole or in part by the aforesaid practices of "testilying" and "flaking" because it was undertaken in a manner which indicated that the individual Defendant Police Officers who participated in Plaintiff DWAYNE LESLIE's arrest falsely averred that Plaintiff DWAYNE LESLIE had sold drugs to an undercover officer in support of the prosecution of Plaintiff.

184. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been effected in whole or in part by the aforesaid practices of "testilying" and "flaking" because the Defendant Police Officers arrested and initiated criminal proceedings against Plaintiff DWAYNE LESLIE after it was already established that Plaintiff DWAYNE LESLIE was not carrying any weapons or illegal substances, and did not have any outstanding warrants against him, but after Plaintiff DWAYNE LESLIE had been seized and brutally beaten by the Defendant Police Officers.

## ARREST QUOTAS

185. Upon information and belief, the arrest of Plaintiff DWAYNE LESLIE was

---

[7] Parascandola, Kappstatter, Doyle and Schapiro, "Cop Morale Low After String of NYPD Scandals Puts Department Under Fire," New York Daily News, October 23, 2011, incorporated by reference herein and available online at http://articles.nydailynews.com/2011-10-23/local/30329895_1_bronx-cop-internal-affairs-bureau-captains-endowment-association

motivated wholly by the Defendant Police Officers' need to meet quantitative enforcement "productivity goals" promulgated by Defendant CITY OF NEW YORK.

186. Upon information and belief, the arrest of Plaintiff DWAYNE LESLIE was motivated in part by the Defendant Police Officers' need to meet quantitative enforcement "productivity goals" promulgated by Defendant CITY OF NEW YORK.

187. Upon information and belief, the arrest of Plaintiff DWAYNE LESLIE was motivated wholly by the Defendant Police Officers' need to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK's police department.

188. Upon information and belief, the arrest of Plaintiff DWAYNE LESLIE was motivated in part by the Defendant Police Officers' need to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK's police department.

189. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may be inferred as a finding of fact when, on June 24, 2010, the Honorable Judge Shira A. Scheindlin in Floyd v. City of New York, United States District Court, Southern District of New York, 08 CV 1034, ordered the release of documentation in the possession of the Defendant New York City Police Department's Internal Affairs Bureau, which investigates claims of serious misconduct and corruption of members of the NYPD.  The court held that the Plaintiff in that case had overcome the law enforcement privilege due the strong public interest in uncovering the civil rights violations alleged in the Complaint, and by demonstrating a compelling need to review such documentation.  The court noted that the law enforcement privilege is a qualified privilege which may be overcome by establishing: 1) that the suit is non-frivolous and brought in good faith; 2) that the information sought is not available through other discovery or from other sources; and 3) that the party has a compelling need for the privileged information.

190. The existence of the aforesaid unconstitutional arrest quota custom and/or policy was confirmed as a finding of fact when, on February 18, 2011, the jury in Bryant v. City of New York, Kings County Supreme Court Docket #022011/2007, found that Plaintiff in that case's arrest had resulted from a policy "regarding the number of arrests officers were to make that violated Plaintiff's constitutional rights and contributed to her arrest" imposed by Defendant City of New York.

191. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may additionally be inferred from repeated occurrences of similar wrongful conduct, as documented in lawsuits including but not limited to the following civil rights actions filed against the City of New York:

- **Alvin Williams v. The City of New York et al.,** United States District Court, Southern District of New York, 05 CV 4013.

- **Corey Williams v. The City of New York et al.,** United States District Court, Eastern District of New York, 07 CV 5362.

192. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the admission by Deputy Commissioner Paul J. Browne, as reported by the media on November 8, 2010, that commanders are permitted to set "productivity goals."[8]

193. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the posting of lists of quantitative targets for various forms of summonses at the 77th Precinct in Brooklyn.  See fn8.

194. Attached hereto as **Exhibit "C"** are copies of the quantitative target sheets obtained from the 77th Precinct by or on behalf of the New York Daily News, as referenced in the aforesaid November 8, 2010 New York Daily News article.

195. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tapes recordings acquired by WABC-TV/DT, including, among other admissions, a 41st precinct sergeant explaining that each of his officers is held to a twenty summons per month and one arrest per month enforcement quota, as reported by the media on March 3, 2010.[9]

196. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the tape recordings acquired by the Village Voice, including, among other admissions, an 81st precinct sergeant telling his officers to make "special" arrests as directed by their superiors even if they must void the arrests at the end of their shifts, as reported by the media on May 11, 2010.[10]

197. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the testimony of above-referred former NYPD Officer Steve Anderson, who stated that he gave the drugs that he had obtained in a nightclub in Queens to former NYPD Officer Henry Tavarez because Officer Tavarez had been having trouble meeting his quotas and was consequently in

---

[8] Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.

[9] Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010. Article incorporated by reference herein and available online at http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.

[10] Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into A Ghost Town."  Village Voice, May 11, 2010. Article incorporated by reference herein and available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

danger of losing his assignment.  See fn5.

198. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because they were undertaken in the absence of probable cause to arrest.

199. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because it was undertaken in a manner which indicated that the individual Defendant Officers who participated in Plaintiff DWAYNE LESLIE's arrest made the determination to arrest Plaintiff DWAYNE LESLIE before determining why Plaintiff DWAYNE LESLIE should be arrested.

200. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because it was undertaken in a manner which indicated that the individual Defendant Officers who participated in Plaintiff DWAYNE LESLIE's arrest falsely averred to Plaintiff DWAYNE LESLIE's involvement in a drug sale when no actual drugs were recovered from Plaintiff DWAYNE LESLIE or any police officer alleged to have interacted with Plaintiff DWAYNE LESLIE.

201. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been motivated in whole or in part by the aforesaid unconstitutional arrest quota custom and/or policy because Plaintiff DWAYNE LESLIE was arrested after it was already established that he was not carrying any weapons or illegal substances, did not have any outstanding warrants against him, and was not engaged in illegal conduct of any kind just before the time of his arrest.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

202.  Plaintiff DWAYNE LESLIE repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

203. All of the aforementioned acts of the Defendant CITY and Defendant "John Doe" POLICE OFFICERS, their agents, servants and employees, were carried out under the color of state law.

204. All of the aforementioned acts deprived Plaintiff DWAYNE LESLIE of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

205. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

206. The acts complained of were carried out by the aforementioned individual

defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

207. The Defendant "John Doe" POLICE OFFICERS and Defendant City Of New York, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

208. As a result of the above constitutionally impermissible conduct, Plaintiff DWAYNE LESLIE was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and standing within his community.

209. As a result of Defendants' impermissible conduct, Plaintiff DWAYNE LESLIE demands judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. § 1983

210. Plaintiff DWAYNE LESLIE repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

211. As a result of the aforesaid conduct by Defendants, Plaintiff DWAYNE LESLIE was subjected to an illegal, improper and false arrest by the Defendants "John Doe" Police Officers and taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

212. As a result of the above constitutionally impermissible conduct, Plaintiff DWAYNE LESLIE was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and standing within his community.

213. As a result of Defendants' impermissible conduct, Plaintiff DWAYNE LESLIE demands judgment against Defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF
## FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

214. Plaintiff DWAYNE LESLIE repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

215. The Defendant "John Doe" POLICE OFFICERS and Defendant CITY OF

NEW YORK had an affirmative duty to intervene on Plaintiff DWAYNE LESLIE'S behalf to prevent the above-referred violations of their constitutional rights.

216. The individual Defendant "John Doe" POLICE OFFICERS failed to intervene on Plaintiff DWAYNE LESLIE'S behalf to prevent the violation of his constitutional rights despite having had realistic opportunities to do so.

217. The individual Defendant "John Doe" POLICE OFFICERS failed to intervene on Plaintiff DWAYNE LESLIE's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which Plaintiff DWAYNE LESLIE's rights were violated by their affirmative conduct.

218. As a result of the aforementioned conduct of the individual defendants, Plaintiff DWAYNE LESLIE'S constitutional rights were violated.

219. As a result of the above constitutionally impermissible conduct, Plaintiff DWAYNE LESLIE was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and standing within his community.

220. As a result of Defendants' impermissible conduct, Plaintiff DWAYNE LESLIE demands judgment against Defendants in a sum of money to be determined at trial.

### FOURTH CLAIM FOR RELIEF
### EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

221. Plaintiff DWAYNE LESLIE repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

222. Defendant "John Doe" POLICE OFFICERS administered a brutal beating upon Plaintiff DWAYNE LESLIE in the absence of need for such action and force.

223. Defendant "John Doe" POLICE OFFICERS threw, shoved, and subjected Plaintiff DWAYNE LESLIE to several physically aggressive maneuvers without Defendants identifying a requisite need for such action and force.

224. On orders of one or more senior Defendant "John Doe" POLICE OFFICERS, police officers kept Plaintiff DWAYNE LESLIE handcuffed to his hospital bed for several days, despite Plaintiff DWAYNE LESLIE's injuries rendering him substantially incapable of flight.

225. On orders of one or more senior Defendant "John Doe" POLICE OFFICERS, police officers kept Plaintiff DWAYNE LESLIE handcuffed to his hospital bed for several days, despite Plaintiff DWAYNE LESLIE's entirely cooperative and agreeable demeanor and behavior.

226. The level of force employed by Defendant "John Doe" Police Officers against Plaintiff DWAYNE LESLIE was objectively unreasonable.

227. The force employed by Defendant "John Doe" Police Officers against Plaintiff DWAYNE LESLIE did not advance any proper government objective.

228. As a result of the aforementioned conduct of defendants, Plaintiff DWAYNE LESLIE was subjected to excessive force and sustained physical injuries.

229. As a result of the aforementioned conduct of Defendant "John Doe" POLICE OFFICERS, Plaintiff DWAYNE LESLIE suffered and sustained injuries to his left ankle.

230. As a result of the aforementioned conduct of Defendant "John Doe" POLICE OFFICERS, Plaintiff DWAYNE LESLIE suffered and sustained injuries to his face.

231. As a result of the aforementioned conduct of Defendant "John Doe" POLICE OFFICERS, Plaintiff DWAYNE LESLIE suffered from double vision.

232. As a result of the aforementioned conduct of Defendant "John Doe" POLICE OFFICERS, Plaintiff DWAYNE LESLIE suffered from blurry vision.

233. As a result of the aforementioned conduct of Defendant "John Doe" POLICE OFFICERS, Plaintiff DWAYNE LESLIE suffered and sustained injuries to his teeth.

234. While in the hospital and still in the custody of the Defendant New York Police Department, Plaintiff DWAYNE LESLIE was handcuffed to his hospital bed.

235. While in the hospital and still in the custody of the Defendant New York Police Department and handcuffed to his hospital bed, Plaintiff DWAYNE LESLIE had recently received surgery on his left ankle.

236. While in the hospital and still in the custody of the Defendant New York Police Department and handcuffed to his hospital bed, Plaintiff DWAYNE LESLIE had recently received surgery on his left ankle and was not a flight risk.

237. The Defendant New York Police Department's act of handcuffing Plaintiff DWAYNE LESLIE to his hospital bed when he had recently received surgery on his left ankle and was not a flight risk constituted a use of unnecessary force.

238. The Defendant New York Police Department's act of handcuffing Plaintiff DWAYNE LESLIE to his hospital bed when he had recently received surgery on his left ankle and was not a flight risk constituted a use of excessive force.

239. As a result of the above constitutionally impermissible conduct, Plaintiff DWAYNE LESLIE was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and

standing within his community.

240. As a result of Defendants' impermissible conduct, Plaintiff DWAYNE LESLIE demands judgment against Defendants in a sum of money to be determined at trial.

## FIFTH CLAIM FOR RELIEF
## MUNICIPAL LIABILITY UNDER *MONELL*

241. Defendants used excessive force on Plaintiff DWAYNE LESLIE in the absence of any evidence of criminal wrongdoing or other justification for the use of such force, notwithstanding their knowledge that said uses of force were unreasonable, unjustified, and would jeopardize Plaintiff DWAYNE LESLIE's liberty, well-being, safety and constitutional rights.

242. Defendants arrested and incarcerated Plaintiff DWAYNE LESLIE in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrest and incarceration would jeopardize Plaintiff DWAYNE LESLIE'S liberty, well-being, safety and constitutional rights.

243.  The acts complained of were carried out by the aforementioned individual Defendant "John Doe" POLICE OFFICERS in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

244. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

245. The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

    a. the continuing practice or custom of New York City Police Officers utilizing disproportionate force in a punitive, retaliatory or otherwise wrongful manner in interactions with civilians generally;

    b. the continuing practice or custom of New York City Police Officers utilizing disproportionate force in a punitive, retaliatory or otherwise wrongful manner in interactions with minorities;

    c. the continuing practice or custom of New York City Police Officers wrongfully arresting individuals without conducting investigations sufficient to ascertain whether there is probable cause to arrest said persons;

    d. the continuing practice or custom of New York City Police Officers wrongfully arresting minority individuals without conducting investigations sufficient to ascertain whether there is probable cause to arrest said persons;

e.  the continuing practice or custom of New York City Police Officers wrongfully supporting improper arrests of individuals through "testilying" and "flaking;"

f.  the continuing practice or custom of New York City Police Officers wrongfully supporting improper arrests of minority individuals through "testilying" and "flaking;"

g.  the continuing practice of failing to properly screen, supervise, discipline, transfer, counsel, or otherwise control police officers engaged in the excessive use of force or in warrantless or otherwise unconstitutional arrests or otherwise impermissible violations of individuals' constitutional rights, particularly with respect to officers who are repeatedly accused of such acts;

h.  the custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence," wherein members of the New York City Police Department intentionally and willfully fail to cooperate with investigations into the misconduct or corrupt activities of their fellow officers, a practice which leads New York City Police Officers to regularly condone and cover up police abuse of power by telling false and incomplete stories.

246. The existence of the aforesaid unconstitutional custom, policy or practice of utilizing disproportionate force in a punitive, retaliatory or otherwise wrongful manner in interactions with individuals and groups of individuals engaged in the exercise of their First Amendment rights to free speech and expressive association may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the City of New York:

a.  **Alford et al. v. The City of New York et al.,** United States District Court, Southern District of New York, 06 CV 2512

b.  **Time's Up et al. v. The City of New York et al.,** United States District Court, Southern District of New York, 07 CV 9557

c.  **Stanley v. The City of New York et al.,** United States District Court, Southern District of New York, 08 CV 3885

d.  **Lin et al. v. The City of New York et al.,** United States District Court, Southern District of New York, 09 CV 1936

247. The existence of the aforesaid unconstitutional customs, policies or practices of wrongfully arresting individuals without warrants and without conducting investigations sufficient to ascertain whether there is probable cause to arrest said persons may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the City of New York:

a.  **White v. The City of New York et al.,** United States District Court, Southern District of New York, 08 CV 0514

b.  **Givens v. The City of New York et al.,** United States District Court, Southern District of New York, 08 CV 5012

    c. **Stanley v. The City of New York et al.,** United States District
       Court, Southern District of New York, 08 CV 3885
    d. **Lin et al. v. The City of New York et al.,** United States District
       Court, Southern District of New York, 09 CV 1936

248. The above-referred custom or practice of members of the New York City
Police Department known as the "Blue Wall of Silence" was discussed at length
on pages 53-59 of the July 7, 1994 Mollen Commission Report. See fn4.

249. One police officer who testified before the Mollen Commission explained
that the code of silence "…starts in the Police Academy, and it just develops from
there…. It starts with the instructors telling you never to be a rat, never give up
your fellow officer.  It starts with other recruits telling you they'll never give you
up, and it just goes down the line as you go… into a precinct." The Report at 55.

250. Another officer who testified before the Mollen Commission stated that
"[c]ops don't tell on cops.  And if they did tell on them, just say if a cop decided to
tell on me, his career's ruined.  He's going to be labeled as a rat…. he's going to
have nobody to work with.  And chances are if it comes down to it… [the
whistleblower's fellow officers are] going to let him get hurt." The Report at 53-54.

251. A third officer who testified before the Mollen Commission concurred,
stating: "[i]f you're labeled a rat… you're going to have a difficult time for the
remainder of your career…. [i]t was something that you couldn't shake." Id. at 54.

252. An NYPD lieutenant who testified before the Mollen Commission
confirmed that officers are at times "ostracized" for breaking the code of silence.
Id.

253. An NYPD captain who disciplined his subordinates for misconduct and
reported allegations of corruption to NYPD Internal Affairs explained to the
Mollen Commission that he had been transferred to thirty-eight (38) different
commands in the course of his career, and in almost every case "he found
evidence that his reputation had preceded him.  At one command, his locker was
burned; at another, his car tires were slashed; at another, he received threats of
physical harm." Id.

254. The *Mollen Commission Report* explicitly identified police brutality,
including "implicit or explicit threat[s] of physical harm[,]" and official tolerance
thereof, as critical issues that must be investigated by "any Commission
investigating police corruption." Id. at 44.

255. The *Mollen Commission* went on to fault the NYPD's intelligence gathering
regarding incidents of brutality as "wholly inadequate." Id. at 45.

256. The *Mollen Commission* found that "[police b]rutality is… used as a rite of initiation to prove that an officer is a tough or 'good' cop, one who can be accepted and trusted by his fellow officers not to report wrongdoing." Id. at 47.

257. One officer who testified before the Mollen Commission noted that brutality "is a form of acceptance.  It's not simply giving a beating.  It's the other officers begin [sic] to accept you more." Id.

258. The Mollen Commission also found that NYPD "supervisors sometimes turn a blind eye to evidence of unnecessary violence…. [b]ecause a complaint usually comes down to an officer's word (and often the word of fellow officer witnesses) against the… [complainant's] word, it is easy for a supervisor to let clear acts of brutality slide by without recourse."  The Report at 49.

259. As of the July 7, 1994 *Mollen Commission Report,* Defendant City of New York had notice that the officers and commanders of the New York City Police Department tolerated and encouraged police to lie to cover up the wrongful conduct of themselves and their fellow officers, including brutal conduct like that which was perpetrated by Defendant "John Doe" POLICE OFFICERS upon Plaintiff DWAYNE LESLIE.

260. That the Defendant City of New York continued to have notice after 1994 that the officers and commanders of the New York City Police Department continued to tolerate and encourage police to lie to cover up the wrongful conduct of themselves and their fellow officers after the publication of the Mollen Commission Report can be shown with reference to the following cases:
   a. Ariza v. City of New York, 1996 U.S. Dist. LEXIS 20250, 14 (E.D.N.Y. March 7, 1996) ["The [municipal] defendants concede, however, that the code exists to prevent other officers from reporting corruption or dishonesty by fellow officers…. [t]he principle behind the 'blue wall of silence' is that officers will suffer recrimination for breaking ranks and subjecting police conduct to public scrutiny."]
   b. White-Ruiz v. City of New York, 1996 U.S. Dist. LEXIS 15571, 23 (S.D.N.Y. October 21, 1996)  ["[P]laintiff offers sufficient evidence to permit a reasonable trier of fact to infer that the 'blue wall of silence' constitutes a custom or usage of the Department"]
   c. United States v. Rosario, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002) ["[Assistant U.S. Attorney] Palmer testified that while supervising the federal investigation into the Louima assault, she routinely confronted a 'blue wall of silence' erected by police officers and PBA officials intent on obstructing efforts to uncover the full truth about what had happened at the 70th precinct on August 9, 1997."]
   d. Barry v. New York City Police Dep't, 2004 U.S. Dist. LEXIS 5951, 40-41 (S.D.N.Y. April 7, 2004) ["[P]laintiff's witnesses speak from firsthand experience about the blue wall of silence…. Plaintiff

complains of acts that are of the precise nature as the customs and practices described in the [Mollen Commission] Report."

e. **Griffin v. City of New York et al.**, 10-CV-01824 (E.D.N.Y. 2010) [Plaintiff detective sues on pattern of retaliation following his reporting fellow detective to Internal Affairs, fellow officers cover for detective accused of misconduct, see, e.g., at ¶35: "Internal Affairs conducted its investigation into [Detective] Plaintiff's allegations [of misconduct] against [Detective] McCarthy. All of the material witnesses failed to cooperate with the investigation by being less than truthful…. [a]s a result, the allegations made by Plaintiff against McCarthy were dismissed as unsubstantiated."]

261. Upon information and belief, the above-referred constitutionally violative policies, practices and customs remain widespread, open, and notorious throughout the NYPD to date.

262. Upon information and belief, the policymakers of the NYPD and Defendant City of New York are aware that these practices and customs of NYPD officers continue to date, and have failed to take adequate steps to curb these practices and customs, which regularly cause the violation of citizens Constitutional rights.

263. Defendant City of New York has failed to meaningfully curb these Constitutionally-violative customs and practices to date.

264. In the introduction to the Mollen Commission Report, it is noted that "the [Internal Affairs] system designed to protect the [New York City Police] Department from corruption minimized the likelihood of uncovering it." The Report at 3.

265. The Mollen Commission Report explained that at that time, the Internal Affairs Division (re-named the Internal Affairs Bureau in a 1993 restructuring) attempted "to close cases with as little effort as possible…. One officer told us they sit around and 'eat donuts and do crossword puzzles' -- and the supervisors and commanders did little more…. an anonymous survey of the work conditions and attitudes of IAD investigators… revealed that almost half of IAD investigators' time was spent on non-investigatory matters  -- and more of their 'investigative' work was done without ever leaving their office…. The facts confirmed IAD's do-nothing reputation." The Report at 85

266. Since the Mollen Commission Report was published in 1994, the number of complaints of police corruption and other misconduct logged annually by NYPD Internal Affairs has nearly quadrupled, rising from 14,789 logs received in

1994 to 44,994 logs received in 2006, the last year for which NYPD reporting is available. *NYPD Internal Affairs 2006 Annual Report*, 12-13.[11]

267. Over that same time period, the number of corruption and other police misconduct complaints investigated annually by NYPD Internal Affairs has fallen by more than half, from 2,258 investigations in 1994 to 1057 investigations in 2006. *Id*.

268. More up-to-date information relating to these customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department is available in "THE PRICE OF BRUTALITY: A special report.; Police Complaints Settled, Rarely Resolved." *The New York Times*, September 17, 1997.[12]

269. Upon information and belief, the steady decline in investigations by NYPD Internal Affairs since the publication of the Mollen Commission Report is representative of a return to a "business-as-usual" mentality with respect to police corruption and brutality within the NYPD.

270. Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively fulfilling its mandate of policing NYPD corruption and brutality generally.

271. Upon information and belief, Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively curbing the established and widespread customs and practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

272. Defendant City of New York has also had notice that the New York City Civilian Complaint Review Board ("CCRB") has not been effective in curbing the above-referred practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

273. This is not a new phenomenon; in Sango v. New York, 1989 U.S. Dist. LEXIS 18214, 40-41 (S.D.N.Y. June 19, 1989), the court found that CCRB investigations into police misconduct were so grossly inadequate that "their predictable results could have led… officers to believe that their conduct, no matter how improper, would go unpunished."

---

[11] 1993-2006 Internal Affairs Reports available online at http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports
[12] Sontag, Deborah & Barry, Dan, *The New York Times*, Sept. 17, 1997 available online at http://www.nytimes.com/1997/09/17/.../price-brutality-special-report-police-complaints-settled-rarely-resolved.hmtl

274. That Defendant City of New York had knowledge of its continuing failure to abate the above-referred practices and customs can be shown with reference to the following facts reported to the City in the *2006 Annual Report* of the CCRB:[13]

    a. Only 12,059 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 received full investigations. *CCRB 2006 Annual Report*, 93.

    b. Only 1,441 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 resulted in a finding of even one substantiated allegation. *Id.*

    c. The NYPD either took no disciplinary action whatsoever or merely issued instructions in 1,062 of the 1,918 cases of CCRB-substantiated police misconduct closed by the department between 2002 and 2006. Some of these cases had been forwarded to the NYPD by the CCRB before 2002. *Id.* at 101.

    d. In the five years between 2002 and 2006 only one (1) NYPD officer was subject to employment termination as a result of allegations of misconduct substantiated by the CCRB. *Id.* at 100.

    e. The CCRB substantiated only 3.5% of the excessive force allegations reported between 2002 and 2006. *Id.* at 95.

275. The New York Civil Liberties Union report on the CCRB's activities between 1994 and 2006, entitled "Mission Failure: Civilian Review of Policing in New York City 1994-2006" ("NYCLU Report")[14] reviewed, collated and summarized information from the CCRB's Annual Reports and other sources, resulting in the following findings:

    a. CCRB complaint data indicates that serious police misconduct, including improper threats and use of force, occurs with significant frequency, with allegations of excessive force in half of all complaints filed with the CCRB. NYCLU Report at 4.

    b. The NYPD takes no disciplinary action whatsoever against nearly 30% of officers named in substantiated CCRB complaints, and gave only "instructions" to nearly a third of officers who were disciplined following substantiated CCRB complaints between 2000 and 2005. Id. at 5.

    c. "In recent years it appears that the NYPD has adopted a radically more lenient disciplinary standard as regards acts of police misconduct directed at civilians. In 2004 the police department ordered instructions in approximately 30 percent of all disciplinary actions related to a substantiated CCRB complaint. In 2005 instructions represented nearly 60 percent of such disciplinary actions; and in 2006 instructions rose to 72 percent of all disciplinary actions related to police misconduct directed at

---

[13] 2001-2010 CCRB Reports available online at http://www.nyc.gov/html/ccrb/html/reports.html

[14] Available online at http://www.nyclu.org/files/ccrb_failing_report_090507.pdf

civilians. Suspension of a police officer has become an extraordinarily rare occurrence, even when egregious acts of misconduct are involved." Id. at 6.

276. In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

277. In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the Defendant City of New York knew or should have known that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

278. The policy of failure to screen, discipline, supervise, counsel, transfer, control, and correct unconstitutional patterns or conditions, is evidenced, inter alia, by the cases and reports cited above.

279. Upon information and belief, Defendant, CITY OF NEW YORK, and the New York City Police Department failed to effectively screen, train, supervise and discipline its police officers, including, but not limited to, Defendant "John Doe" POLICE OFFICERS, as demonstrated by their propensity for group violence, including excessive use of force and restraint, and for their failure to protect citizens from unconstitutional conduct of other police officers.

280. Upon information and belief, Defendant CITY OF NEW YORK, failed to put into place and otherwise maintained an inadequate structure for risk containment and stress management relative to its police officers. Inter alia, the structure was deficient at the time of pre-selection and selection to evaluation and exchange within the command structure about the performance of individual police officers; to the training of supervisory personnel to effectively and adequately evaluate performance of an officer; and to otherwise put the command structure on notice that an individual was at significant levels of risk to the public at large or to specific segments thereof.

281. The net effect of these deficiencies and failures was to permit police officers of the New York City Police Department to function at levels of significant and substantial risk to the public.

282. The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department evince deliberate indifference to the safety, well-being, and constitutional rights of Plaintiff DWAYNE LESLIE.

283. As a result of the above constitutionally impermissible conduct, Plaintiff DWAYNE LESLIE was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to his reputation and standing within his community.

284. As a result of Defendants' impermissible conduct, Plaintiff DWAYNE LESLIE demands judgment against Defendants in a sum of money to be determined at trial.

## SIXTH CLAIM FOR RELIEF
## EQUAL PROTECTION UNDER 42 U.S.C. § 1983

285. Plaintiff DWAYNE LESLIE repeats, reiterates and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

286. At all times described herein, Plaintiff DWAYNE LESLIE was possessed of the right to equal protection under the laws, as guaranteed under the 14th Amendment to the United States Constitution.

287. Defendant "John Doe" POLICE OFFICERS arrested and incarcerated Plaintiff DWAYNE LESLIE in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrest and incarceration would jeopardize Plaintiff's liberty, well-being, safety and constitutional rights.

288. The acts complained of were carried out by the aforementioned individual Defendant "John Doe" POLICE OFFICERS in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

289. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

290. Plaintiff DWAYNE LESLIE was falsely accused of crimes and violations and was taken into Police custody and detained against his will.

291. That following his arrest, Plaintiff DWAYNE LESLIE was charged with crimes and violations.

292. That the above described charges were a pretext intended to justify Plaintiff DWAYNE LESLIE'S illegal arrests.

293. That the actions of Defendant "John Doe" POLICE OFFICERS heretofore described, constituted unlawful detention, imprisonment, assault and battery and malicious prosecution and were designed to and did cause specific bodily harm, pain and suffering both in violation of Plaintiff DWAYNE LESLIE'S Constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for Plaintiff DWAYNE LESLIE'S exercise of his civil and constitutional rights of free, free expressive association as guaranteed by the Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

294. On March 1, 2010, the New York Times published an Op-Ed piece entitled "Watching Certain People," wherein the author cited to New York City Police Department Statistics showing that of the 2,798461 stops made by police officers

during the years 2004 through 2009, African-American men accounted for 1,444,559 of those stops, and Hispanics accounted for 843,817 of those stops, or 51.6 percent and 30.1 percent, respectively.  The vast majority of those stopped, 88.2 percent, were not guilty of any crime.[15]

295. On February 22, 2011, the New York Daily News published an article citing New York Police Department stops for the year 2010, which numbered 601,055.  This figure marked a 4.3 percent increase from the year 2009, and African-American and Latino men accounted for approximately 85 percent of all stops.[16]

296. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to a perceived ease of prosecution of such minority individuals.

297. The particular arrest of Plaintiff DWAYNE LESLIE is believed to have been motivated in whole or in part by a custom or practice of racism of victimization, not of hate, whereby minority individuals are charged with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration, in the absence of probable cause to arrest, due to a perceived ease of prosecution of such minority individuals, because the Defendant "Jon Does" POLICE OFFICERS informed Plaintiff DWAYNE LESLIE that he was being arrested after it was already established that Plaintiff DWAYNE LESLIE was not carrying any weapons or illegal substances, and did not have any outstanding warrants against him,

298. The Defendant "John Doe" POLICE OFFICERS, through their actions, carried out a discriminatory application of such laws, driven by a discriminatory motivation of what might otherwise be facially neutral statutes due to a perceived ease of prosecution.

---

[15] Herbert, Robert, "Watching Certain People," New York Times, March 1, 2010Seattle Post-Intelligencer, February 28, 2008.  Article incorporated herein by reference and available online at: http://www.nytimes.com/2010/03/02/opinion/02herbert.html?scp=7&sq=police%20stop%20frisk%20african%20american%20men&st=cse

[16] Parascandola, Rocco, "New York Police Department Stopped More than 600,000 in 2010, the Highest Number Ever Recorded, February 22, 2011.  Article incorporated herein by reference and available online at: http://articles.nydailynews.com/2011-02-22/news/29442269_1_latino-men-fight-crime-new-yorkers

299. As a result of the aforementioned conduct, the Defendants "John Doe" POLICE OFFICERS have violated Plaintiff DWAYNE LESLIE'S constitutional rights to equal protection, and Plaintiff DWAYNE LESLIE is entitled to seek redress under 42 U.S.C. §1983, and is further entitled to injunctive relief to the extent necessary to prevent further disparate treatment and retaliation.

300. The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the direct and proximate cause of the constitutional violations suffered by Plaintiff DWAYNE LESLIE as alleged herein.

301. The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department were the moving force behind the constitutional violations suffered by Plaintiff DWAYNE LESLIE as alleged herein.

302. As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, Plaintiff DWAYNE LESLIE was subjected to excessive force, false arrest, and excessive and unnecessary detention.

303. As a result of the foregoing, Plaintiff DWAYNE LESLIE was caused to suffer personal injuries, violations of his civil rights, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses, and damage to his reputation and standing within his community.

304. As a result of the foregoing, Plaintiff DWAYNE LESLIE demands judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:      New York, New York

FEBRUARY 2, 2012

Respectfully submitted,

_____~//s//~_____
SAMUEL B. COHEN [SC 0622]
LAW OFFICES OF WYLIE M. STECKLOW
10 SPRING STREET – SUITE 1
New York, New York 10012
[212] 566-8000
[212] 202-4952/FAX
ATTORNEY FOR PLAINTIFF